Per Curiam.
 

 The complainant in his bill states, that his father, Walter Keeble, senior, was in debt to him upwards of $1,500 for the hire of slaves, moneys * paid for him, and other demands; and being in his dotage, and possessed of very little property except six slaves, to wit, a negro man, a woman, and four children, worth at least $1,400, was induced by the slaves to express a desire of liberating them; that the defendant, Cum-mins, being apprised of this desire, offei’ed to aid him in carrying it into effect; alleging, that being in debt he could not do it himself, and suggesting other difficulties. He proposed that the ne-groes should be conveyed to himself; that W. Keeble, senior, might keep possession of them during his life, and after that period that he, Cummins, would liberate them; that on the 27th of March, 1813, the defendant procured separate bills of sale, to be executed to him for each of these six slaves, and at the same time signed and sealed an agreement as follows: “ I promise to pay Walter Keeble, senior, $1,000 in produce; I am to pay the same annually, so as to pay the whole at the end of ten years. I am at liberty to pay it in money if I see cause, or any part thereof; and if I pay the same in money, I am at liberty to pay it at any time I see cause, it being for six negroes I bought of said Keeble, viz.,
 
 &c.”
 
 That shortly after, on the 3d of April, 1813, in the presence of witnesses, paid to said Keeble, senior, $225, and on the ninth, the sum of $254, both which sums were indorsed on the bond, and then privately returned to the defendant. On the bond was also
 
 *551
 
 indorsed a note, that the defendant was to have credit annually for the hire of the negro, and W. Keeble, senior, to keep.them as long as he pleased, or as long as he lived. The complainant having failed in several attempts to settle with his father, commenced suits, and obtained judgments against him for upwards of $200, and procured executions to be levied on the negro woman and her children; but before the day appointed for * the sale, the defendant got possession of them, and refused to return them, hut claims them as his own absolute property.
 

 The bill further states that the complainant settled all accounts with his father in a manner satisfactory to him. In the settlement it appeared that his father was indebted to him in the sum of $1,546, and having no other means of payment, executed to him a bill of sale for those six negroes. He charges that the defendant refuses to give up his bills of sale or the possession of the negroes; that the bills of sale were fraudulent, procured by the management of the defendant without any consideration, and without any intention of liberating the slaves, but to keep them- for his own use, and defeat the complainant of his just debt. He prays that the defendant may be decreed to deliver up the bills of sale to be canceled, deliver up possession of the slaves, and account for and pay hire for the time he had them, and for relief generally.
 

 The defendant in his answer states, that W. Keeble, senior, informed him that a difference had taken place between him and his son; that he could live with his son no longer; was old, destitute of the means of subsistence, and offered to sell the negroes for $1,000 ; that defendant agreed to give the sum on condition that the payments might be made in ten annual installments, and in such articles of consumption as W. Keeble, senior, might want. A few days afterwards W. Keeble, senior, expressing an anxiety to close the contract, it was done accordingly, and on the 27th of March, 1818, the bills of sale were executed for the slaves, to wit: Baldy, Sukey, and their four children. The defendant executed at the same time a bond for the payment as stated in the bill, and possession of the slaves was delivered. W. Keeble, senior, afterwards being dissatisfied with his place of residence, expressed a desire that the negroes should live * with him, and agreed and executed a covenant to hire them at the rate of eight dollars per month, and give credit on the defendant’s note for the amount of the hire,
 
 *552
 
 and be at liberty to give them up when he pleased. The defendant says he paid on his bond the sums indorsed thereon, and W. Keeble, senior, appearing desirous that the slave Baldy should be liberated at his death, the defendant agreed thereto, and $470, which had been paid, were refunded, and Baldy was delivered up, and the defendant has no claim to him, except for the hire; that other payments were made (stating them), amounting to about $47; that in September, 1813, while the defendant was absent in the militia, the complainant, as he believes, obtained judgment against W. Keeble, senior, had the execution levied on the negro woman and children. The officer permitted them to remain in the possession of .the said Keeble, .senior, who delivered them to the defendant’s wife, accompanied by a letter declaring his intention to abide by tbe contract he had made. The defendant denies that he had information of any debt due from W. Keeble, senior, to the complainant, and believes none existed; but that the subsequent bill of sale made to the complainant was fraudulent and without consideration. He denies that the sale to him was in any respect, conditional, or that there was any agreement respecting their liberation at a future day, or that he ever agreed to redeliver the ne-groes to W. Keeble, senior, when the controversy between him and the complainant was settled; and claims an absolute right to Sukey and her children by virtue of his contract.
 

 By the evidence it appears that Keeble, senior, in 1813, was nearly eighty years of age, that he was under great imbecility of mind, and subject alternately to credulity and distrust, and was liable to be easily imposed upon ; that he was incapable of transacting important business with propriety; that he was * indebted to the complainant, but to what amount is uncertain. The. negroes included in the bills of sale were at the time of the contract, in the estimation of the witnesses, worth from $1,500 to $1,950. And at that time he was much displeased with and at variance with the complainant, who was his only child. It was also proved, that after the reconciliation,
 
 W.
 
 Keeble, senior, offered to pay the defendant the sum of $30, which the witness understood from both was about the sum due to the defendant for articles furnished. The same witness says that the defendant agreed to give up the ne-groes if they could be secured so that the complainant could not get them.
 

 
 *553
 
 What is the law which we are led by these facts to apply ? Frauds may be committed by two persons against one, or by one person upon another. And in equity it is a fraud if one person, taking advantage of the mental imbecility of another, shall procure from him a bargain manifestly and enormously unequal, especially if pretenses be used which are not intended to be realized.
 

 Upon this ground the bill is not expressed in terms as pointed as could be wished, but yet broad enough to comprehend the principles which the court will now go upon. These are the same that were applied in the case of
 
 Clarkson
 
 v.
 
 Hanway
 
 and others, in 2 P. W. 202. Han way, an old man of 72 years of age, conveyed to a person of the name of Hanway, a real estate worth £40 per annum, for an annuity of £20 per annum for his life, not taking any security for payment of the annuity, but the covenant of the grantee. The grantor never in his life expressed any dissatisfaction, but on the contrary often declared his wish that the estate might go to the grantee. Yet these circumstances appearing, together with proof that the grantor was easily imposed upon, together with his age, the court set aside the conveyance. In the present case the old man was nearly 80 years * of age, had an only child with whom he was displeased. His dispositions were fickle and changeable, and the state of his understanding such that, several intelligent persons of the neighborhood say, unfitted him to make any contract of importance. In this situation he bargains with a stranger to his name and blood ; lets him have negroes worth $1,950 for the nominal sum of $1,000, to be paid for in ten annual installments out of the hire of the negroes. For Keeble, senior, is to give for them $96 in money per annum, and to be paid in articles of country produce, such as he might want at the rate of' $100 per annum. The former is of more value than the latter. Advantage was taken of his then state of mind with respect to his son, and for all this property which the old man parted with by the six bills of sale to Cummins, he was to have in our estimation, not one farthing. Is it consistent with the principles of a jurisprudence the basis whereof is honesty, that such a contract shall be supported ? Surely, no. It ought in justice to be set aside. But in whose favor can it be set aside ? It is said not in favor of this complainant, who appears as grantee in a bill of sale, which, if Cum-mins’s deeds be set aside for the weakness of the grantor, so must this also of a posterior date, when the grantor cannot be
 
 *554
 
 supposed to have improved in his capacities. 'The fallacy of this argument consists in not taking all together the
 
 whole
 
 reasons which cause a deed to be set aside. It is not weakness alone, but weakness imposed upon and abused,,and taken an unconscientious advantage of, to the detriment of the weak man, and the extravagant gain of the
 
 person imposing
 
 upon him. Wherever these circumstances are not attributable to a contract, it is good notwithstanding the weakness of the grantor. Wherever they are attributable to it they effect its invalidation. In this view of the case, Keeble, the elder, might as well put in his place by substitution, his son, to demand a nullification * of Cummins’s contract, as to demand it himself, and as well as the heir could in the case of Clarkson and Hanway. The bill of sale to Keeble, the complainant, cannot be said to be voluntary, for a
 
 valuable
 
 consideration is
 
 ex
 
 pressed, and the consideration of blood is implied and known to exist. Equity will act for a wife or child as well as for creditors or purchasers. 1 Fonb. 348. Upon this ground, even if the bills of sale to the complainant were void, he might, by taking out letters of administration, arrive at the same point the heirs did in the case of Hanway. It is unnecessary to advert to the claims of the complainant as a creditor; for if upon taking an account his demands should be inferior in value to the negroes, yet as to the residue, that also ought not to stand ; and therefore it is better for the purposes of complete justice, that the court should not proceed upon the ground of fraud upon creditors. This decree will only operate between the parties to this bill, not between any one of them and third persons, who, either as creditors or otherwise, may still assert their claims against this property, and if they have a better claim than the complainant, may succeed in it notwithstanding this decision.
 

 Let the bill of sale be set aside wholly, and the negroes be delivered to the complainant, he paying such sums as were advanced by Cum-mins to the old man, and interest thereon; and Cummins on his part to account for the hire of the negroes during the time they remained in his possession.
 

 See
 
 King
 
 v.
 
 Cohorn,
 
 6 Yer. 75;
 
 Gass
 
 v.
 
 Mason,
 
 4 Sneed, 497;
 
 Craddock
 
 v.
 
 Cabiness,
 
 1 Swan, 474;
 
 Walker
 
 v.
 
 McCoy,
 
 3 Head, 103;
 
 Johnson
 
 v.
 
 Chadwell,
 
 8 Hum. 145;
 
 Walton
 
 v.
 
 Northington, 5
 
 Sneed, 282;
 
 Tally
 
 v.
 
 Smith,
 
 1 Cold. 290;
 
 Davis
 
 v.
 
 McNally,
 
 5 Sneed, 583;
 
 Clark
 
 v.
 
 Jetton,
 
 5 Sneed, 229;
 
 Hadley
 
 v.
 
 Latimer, 3
 
 Yer. 537;
 
 Birdsong
 
 v.
 
 Birdsong,
 
 2 Head, 289; King’s Digest, 2280, 2300, 3528
 
 et seq.